USDC SCAN INDEX SHEET

SUI 6/9/06 13:33

3:06-CR-01243 USA V. LEON

*1*

*CRINDI.*

SECRET
unsealed 6/16/06

FILED
06 JUN -6 PM 4:26

BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2006 Grand Jury 06 CR 1243 - DMS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>RAUL LEON (1),<br>aka Huero Sherm,<br>aka Sherm,<br>aka Huero,<br>JUVENAL VEGA-SOTO (2),<br>aka Kenny,<br>aka Carnal Kenny,<br>aka K,<br>aka Kenario Garcia,<br>RICARDO MARTINEZ (3),<br>aka Gato,<br>aka Grandpa,<br>aka The Old Man,<br>aka The Grouch,<br>aka CG,<br>aka The Evil One,<br>EDUARDO GONZALEZ-GALLEGOS (4),<br>aka Lalo,<br>aka Youngster,<br>aka The Young One,<br>aka The Pup,<br>aka Mike Bibby,<br>aka Sacra,<br>aka Frenchie,<br>aka Stepper,<br>aka Red Stepper,<br>aka The Young Stud,<br>GEORGE FERNANDEZ (5),<br>aka Rascal,<br>aka Primo,<br>aka George Valentino,<br>aka George Valentine,<br>aka Vale,<br>aka Vale Leon,<br>aka Vale Guerrero,<br>aka Vale De La Playa, | Criminal Case No. ____________<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 1962(d) - Conspiracy to Conduct Enterprise Affairs Through A Pattern of Racketeering Activity |

1 vg

TWR:nlv:San Diego
6/6/06

THOMAS DURKIN (6), )
aka Tommy Peterson, )
aka Richie Cunningham, )
aka Howdy Doody, )
aka Tommy Montoya, )
aka Tommy Plichta, )
ALEX GOMEZ (7), )
aka Clyde, )
JESSIE MUNOZ (8), )
aka Big Jessie, )
SALVADOR PEREZ (9), )
aka Sal, )
aka Serio, )
RICHARD VALENZUELA (10), )
aka Chavo, )
CESAR ABARCA (11), )
aka Sparky, )
CESAR MOEDANO (12), )
aka Snoop, )
aka Snoops, )
JAVIER CASTRELLON (13), )
aka Jarhead, )
aka Javi, )
DEMITRO CONTRERAS (14), )
GUILLERMO REYES (15), )
aka Memo, )
JESUS ANTONIO ARMENTA (16), )
aka Tony, )
JOSHUA CRUZ (17), )
aka Travieso, )
ROBERT ROMERO (18), )
aka Carnal Bobby, )
aka Bobby, )
aka Bobby Norwalk, )
aka Buzzard, )
MARTIN REYES (19), )
EDNA DAVILA (20), )
aka Edna Moreno, )
aka Virginia Davila, )
MARY LOU VEGA (21), )
aka Gordi, )
aka Gordita, )
ANGELA ESPARZA (22), )
aka Petey, )
)
Defendants. )
______________________________ )

The grand jury charges:

//

//

//

**Count 1**

**THE RACKETEERING CONSPIRACY**

1. Beginning in or about November 1986, and continuing up to and including June 6, 2006, within the Southern District of California and elsewhere, defendants RAUL LEON, aka Huero Sherm, aka Sherm, aka Huero, JUVENAL VEGA-SOTO, aka Kenny, aka Carnal Kenny, aka K, aka Kenario Garcia, RICARDO MARTINEZ, aka Gato, aka Grandpa, aka The Old Man, aka The Grouch, aka CG, aka The Evil One, EDUARDO GONZALEZ-GALLEGOS, aka Lalo, aka Youngster, aka The Young One, aka The Pup, aka Mike Bibby, aka Sacra, aka Frenchie, aka Stepper, aka Red Stepper, aka The Young Stud, GEORGE FERNANDEZ, aka Rascal, aka Primo, aka George Valentino, aka George Valentine, aka Vale, aka Vale Leon, aka Vale Guerrero, aka Vale De La Playa, THOMAS DURKIN, aka Tommy Peterson, aka Richie Cunningham, aka Howdy Doody, aka Tommy Montoya, aka Tommy Plichta, ALEX GOMEZ, aka Clyde, JESSIE MUNOZ, aka Big Jessie, SALVADOR PEREZ, aka Sal, aka Serio, RICHARD VALENZUELA, aka Chavo, CESAR ABARCA, aka Sparky, CESAR MOEDANO, aka Snoop, aka Snoops, JAVIER CASTRELLON, aka Jarhead, aka Javi, DEMITRO CONTRERAS, GUILLERMO REYES, aka Memo, JESUS ANTONIO ARMENTA, aka Tony, JOSHUA CRUZ, aka Travieso, ROBERT ROMERO, aka Carnal Bobby, aka Bobby, aka Bobby Norwalk, aka Buzzard, MARTIN REYES, EDNA DAVILA, aka Edna Moreno, aka Virginia Davila, MARY LOU VEGA, aka Gordi, aka Gordita, and ANGELA ESPARZA, aka Petey, and others known and unknown to the grand jury, being employed by and associated with the Enterprise (as defined below), which Enterprise was engaged in, and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with other persons known and unknown, to conduct and participate, directly and indirectly, in

the conduct of the Enterprise's affairs through a pattern of racketeering activity, as defined by Title 18, United States Code, Sections 1961(1) and 1961(5), and as described in paragraph 18 of this Count; all in violation of Title 18, United States Code, Section 1962(c).

**THE ENTERPRISE**

2. At various times material to this indictment:

Defendants RAUL LEON, aka Huero Sherm, aka Sherm, aka Huero, JUVENAL VEGA-SOTO, aka Kenny, aka Carnal Kenny, aka K, aka Kenario Garcia, RICARDO MARTINEZ, aka Gato, aka Grandpa, aka The Old Man, aka The Grouch, aka CG, aka The Evil One, EDUARDO GONZALEZ-GALLEGOS, aka Lalo, aka Youngster, aka The Young One, aka The Pup, aka Mike Bibby, aka Sacra, aka Frenchie, aka Stepper, aka Red Stepper, aka The Young Stud, GEORGE FERNANDEZ, aka Rascal, aka Primo, aka George Valentino, aka George Valentine, aka Vale, aka Vale Leon, aka Vale Guerrero, aka Vale De La Playa, THOMAS DURKIN, aka Tommy Peterson, aka Richie Cunningham, aka Howdy Doody, aka Tommy Montoya, aka Tommy Plichta, ALEX GOMEZ, aka Clyde, JESSIE MUNOZ, aka Big Jessie, SALVADOR PEREZ, aka Sal, aka Serio, RICHARD VALENZUELA, aka Chavo, CESAR ABARCA, aka Sparky, CESAR MOEDANO, aka Snoop, aka Snoops, JAVIER CASTRELLON, aka Jarhead, aka Javi, DEMITRO CONTRERAS, GUILLERMO REYES, aka Memo, JESUS ANTONIO ARMENTA, aka Tony, JOSHUA CRUZ, aka Travieso, ROBERT ROMERO, aka Carnal Bobby, aka Bobby, aka Bobby Norwalk, aka Buzzard, MARTIN REYES, EDNA DAVILA, aka Edna Moreno, aka Virginia Davila, MARY LOU VEGA, aka Gordi, aka Gordita, and ANGELA ESPARZA, aka Petey (collectively "Defendants"), and others known and unknown to the grand jury, were members and associates of an organization whose members engaged in, among other things, murder, conspiracy to

commit murder, attempted murder, conspiracy to import controlled substances into the United States from a place outside thereof, conspiracy to distribute controlled substances for financial gain, distribution of controlled substances, possession with intent to distribute controlled substances, conspiracy to launder the proceeds of illegal activity, conspiracy to interfere with commerce through treats of violence and robbery. At all relevant times, this organization, known as "La Eme" or the "Mexican Mafia," operated in the Southern District of California and elsewhere. The Mexican Mafia and the individuals who associate with it for criminal purposes constitute an "Enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Enterprise"), that is, a group of individuals associated in fact. The Enterprise constitutes an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the Enterprise. The Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

**BACKGROUND ON THE MEXICAN MAFIA**

3. The Mexican Mafia is a powerful gang which controls drug distribution and other illegal activities within portions of both the California and Federal penal systems, and which has increasingly worked to expand its influence over illegal activities outside of those prison systems.

4. When Mexican Mafia members or associates serve their sentences and rejoin their communities, they remain loyal to the Mexican Mafia and work to further the goals of the Mexican Mafia outside the prison environment.

//

5. A person can be admitted to the Mexican Mafia either while he is in prison (on the "inside") or in the community (on the "outside"). It takes the vote of three members to admit a new member. A member of the Mexican Mafia is referred to as "brother," "carnal," or "big homie."

6. The Mexican Mafia enforces its rules and promotes discipline among its members and associates by murdering, conspiring to murder, assaulting and threatening those members and associates who violate the rules or pose a threat to the Enterprise. The murder or assault of a member may be carried out only if it is authorized by other members. A member may independently authorize the murder or assault of a non-member or associate.

7. The Mexican Mafia has attempted to organize Hispanic street gangs throughout Southern California. Members of the Mexican Mafia have contacted members of Hispanic street gangs in the San Diego area for the purpose of establishing a larger network for the Mexican Mafia's illegal activities. The main purpose of those meetings has been to organize Hispanic street gangs into a larger, Mexican Mafia-controlled, criminal organization. Significant goals of the Mexican Mafia are to control, and profit from, narcotics trafficking in Southern California.

8. If a street gang does not accede to Mexican Mafia demands, the Mexican Mafia will assault and order the assault of the gang's members both in custody and out on the streets. This is done, in part, through placing a gang or individual on the Mexican Mafia's hit list, also know as being "in the hat," which list is disseminated in various ways. Gangs or individuals on the hit list are frequently

//

said to have a "green light," "luz," "cup of tea," or "verde," although other expressions are also used at times.

9. In addition to intimidation through direct assaults, the Mexican Mafia is able to assert control and influence over gang members outside the penal system because: (1) the gang members do not want their incarcerated members to be assaulted, and (2) the gang members want protection provided by the Mexican Mafia if they ever become incarcerated.

10. The Mexican Mafia requires street gangs to pay a "tribute" or a "tax" (hereinafter referred to as "tax") on a regular basis. Tax payments are made in cash, narcotics and other tangible property. If a gang pays the tax, the Mexican Mafia permits gang members to exert influence over, and to traffic in, narcotics in their neighborhoods and territories. If a gang fails to pay the tax (or otherwise fails to comply with the dictates of the Mexican Mafia), the Mexican Mafia will place a "green light" on the members of the gang, which authorizes Mexican Mafia members and associates, as well as rival gangs, to assault and/or murder members of the gang, both in the community and within the penal system, until the gang pays the tax.

11. The Mexican Mafia also exercises control over non-gang affiliated narcotics dealers by taxing them. If they pay taxes, the narcotics dealers are permitted to sell narcotics in their designated areas, and are protected from rivals selling narcotics in the same area. As with street gangs, if a narcotics dealer fails to pay the tax, the Mexican Mafia will authorize a "hit" (murder and/or assault) of the narcotics dealer, or rob the narcotics dealer of his/her drugs and money.

//

12. Members, associates and affiliates of the Mexican Mafia routinely use mail drops to communicate with each other. For example, a prisoner will send a letter addressed to an individual at a mail drop address. From the mail drop, the letter is then sent, either in its original form or transcribed by the person operating the mail drop, to the true intended recipient. Another form of passing information contained in such letters is for the person operating the mail drop to arrange a visit or engage in a telephone conversation with the intended recipient of the message and communicate the message orally or in person. Incarcerated Mexican Mafia members and associates know that their mail is routinely reviewed by prison authorities, particularly when the mail is addressed to other known Mexican Mafia members and/or associates. The mail drop technique is therefore used to thwart efforts of prison authorities to monitor communication between known Mexican Mafia members and/or associates.

**PURPOSE OF THE ENTERPRISE**

13. The members of the Mexican Mafia and their associates constitute a criminal enterprise, referred to below as the "Mexican Mafia," the "Mexican Mafia criminal enterprise," or the "Enterprise." The word "member" below refers to a full member of the Mexican Mafia. Individuals who are affiliated with the Mexican Mafia and who assist the members are known as "associates" of the Mexican Mafia. Both members of the Mexican Mafia and their associates are participants in the Mexican Mafia criminal enterprise.

14. The purposes of the Mexican Mafia criminal enterprise include, but are not limited to, the following:

//

//

a. Enriching the members of the Mexican Mafia through, among other things, the collection of taxes from narcotics traffickers and street gangs.

b. Controlling illegal activities such as narcotics trafficking and extortion inside California and Federal prisons and jails.

c. Controlling the activities of street gangs throughout Southern California.

d. Preserving, protecting and expanding the power of the Mexican Mafia through the use of intimidation, violence, threats of violence, assaults and murders.

e. Preserving the continuity of membership in the Mexican Mafia by threatening members, associates and facilitators wishing to leave the Mexican Mafia with violence, assault and murder.

f. Promoting and enhancing the Mexican Mafia and the activities of its members and associates.

15. At times, disputes arise between members of the Mexican Mafia relating to the conduct of the affairs of the Enterprise. These disputes occasionally involve disagreements relating to membership issues or control over certain territories or gangs. Mexican Mafia members resolve their disputes either by direct negotiation between members (often via the prison mail system), intervention by other more senior and/or well-respected members, or by violence.

**THE MEANS AND METHODS OF THE ENTERPRISE**

16. Among the means and methods by which the defendants and their co-racketeers conduct and participate in the conduct of the affairs of the Mexican Mafia criminal enterprise are the following:

//

a. Members of the Mexican Mafia use the Mexican Mafia criminal enterprise to commit, attempt and threaten to commit, acts of violence, including murder and assault, to protect and expand the Enterprise's criminal operations.

b. Members of the Mexican Mafia use the Mexican Mafia criminal enterprise to promote a climate of fear through violence and threats of violence.

c. Members of the Mexican Mafia promulgate certain rules to be followed by all participants in the Mexican Mafia criminal enterprise including the rule that a participant in the Enterprise not act as an informant to law enforcement authorities regarding the activities of the Enterprise.

d. To enforce the rules of the Mexican Mafia criminal enterprise and to promote discipline, the members of the Mexican Mafia use the Enterprise to murder, attempt to murder, assault and threaten those participants in the Enterprise and others who violate the rules or pose a threat to the Enterprise.

e. Members of the Mexican Mafia vote on the initiation of new members into the Mexican Mafia. The new members are then advised of the rules of the Mexican Mafia.

f. To generate income, participants in the Mexican Mafia criminal enterprise are entitled to conduct, and, in fact, conduct illegal activities under the protection of the Enterprise.

g. To generate income, participants in the Mexican Mafia criminal enterprise engage in the trafficking of controlled substances and collect "taxes" from narcotics traffickers.

h. To generate income, participants in the Mexican Mafia criminal enterprise collect taxes from street gangs.

i. To generate income, participants in the Mexican Mafia commit robberies.

j. To perpetuate the Mexican Mafia criminal enterprise, participants in the Enterprise attempt to conceal from law enforcement the existence of the Mexican Mafia, the identity of its participants, the ways in which it conducts its affairs, and the locations at which it discusses and conducts its affairs.

**ROLES OF THE DEFENDANTS**

17. At various times material to this Indictment, the defendants had the following roles in the Enterprise:

a. Defendant RAUL LEON, (hereinafter "defendant LEON") is a validated member of the Mexican Mafia who is responsible for overseeing Mexican Mafia activities throughout the Southern District of California, and elsewhere. As a validated member of the Mexican Mafia, defendant LEON has the right to vote on the induction of proposed members into the Mexican Mafia, participate in the nomination of new Mexican Mafia members, sanction the murder and/or assault of other Mexican Mafia members, associates of the Mexican Mafia, and others, including Hispanic street gang members. As a validated member of the Mexican Mafia, defendant LEON is entitled to receive a portion of "taxes" collected under the authority of the Mexican Mafia, as well as proceeds from the sale of narcotics within the geographic areas controlled by the Mexican Mafia. At all times material to this indictment, defendant LEON has been incarcerated within the California Department of Corrections and Rehabilitation (California State Prison System). Defendant LEON founded the Shelltown Gamma Boys, a street gang based in San Diego, California.

//

b. Defendant JUVENAL VEGA-SOTO, (hereinafter "defendant VEGA") is a validated member of the Mexican Mafia who is responsible for overseeing Mexican Mafia activities throughout the Southern District of California, and elsewhere. As a validated member of the Mexican Mafia, defendant VEGA has the right to vote on the induction of proposed members into the Mexican Mafia, participate in the nomination of new Mexican Mafia members, sanction the murder and/or assault of other Mexican Mafia members, associates of the Mexican Mafia and others, including Hispanic street gang members. As a validated member of the Mexican Mafia, defendant VEGA is entitled to receive a portion of "taxes" collected under the authority of the Mexican Mafia, as well as proceeds from the sale of narcotics within the geographic areas controlled by the Mexican Mafia. Defendant VEGA is responsible for supplying narcotics to gang members throughout Southern California. Defendant VEGA is a member of the Ontario Black Angels, a street gang based in Ontario, California.

c. Defendant RICARDO MARTINEZ, (hereinafter "defendant MARTINEZ") is a validated member of the Mexican Mafia who is responsible for overseeing Mexican Mafia activities throughout the Southern District of California, and elsewhere. As a validated member of the Mexican Mafia, defendant MARTINEZ has the right to vote on the induction of proposed members into the Mexican Mafia, participate in the nomination of new Mexican Mafia members, sanction the murder and/or assault of other Mexican Mafia members, associates of the Mexican Mafia and others, including Hispanic street gang members. As a validated member of the Mexican Mafia, defendant MARTINEZ is entitled to receive a portion of "taxes" collected under the authority of the Mexican Mafia, as well as proceeds from the sale of narcotics

within the geographic areas controlled by the Mexican Mafia. Defendant MARTINEZ is involved in smuggling narcotics into various federal prisons.

d. Defendant ROBERT ROMERO (hereinafter "defendant ROMERO") is a validated member of the Mexican Mafia who is responsible for coordinating Mexican Mafia activities in and around Norwalk, California. Defendant ROMERO is heavily involved in the importation and distribution of narcotics, as well as the laundering of proceeds derived from the sale of narcotics.

e. Defendant EDUARDO GONZALEZ-GALLEGOS, (hereinafter "defendant GONZALEZ") is a high-level associate, also referred to as a "comarada," of the Mexican Mafia who is responsible for coordinating Mexican Mafia activities throughout San Diego County. As a high-level associate of the Mexican Mafia, defendant GONZALEZ has responsibility over the distribution of narcotics and the "taxation" of individuals operating within the geographic areas controlled by the Mexican Mafia. Defendant GONZALEZ is responsible for sending a portion of the "taxes" or proceeds collected in the name of the Mexican Mafia to incarcerated members of the Mexican Mafia, a practice known as "taking care of," "kicking up," "paying respects" or "kicking up to the Big Homies." Defendant GONZALEZ also has the authority to participate in, and order, the assault of individuals who act contrary to the goals of the Mexican Mafia.

f. Defendants GEORGE FERNANDEZ, THOMAS DURKIN, ALEX GOMEZ, JESSIE MUNOZ and SALVADOR PEREZ are high-level Mexican Mafia "associates" or "camaradas," who are responsible for directing and carrying out the day-to-day business of the Mexican Mafia, including,

//

but not limited to, murder, assault, distributing narcotics, extortion and money laundering.

g. Defendants RICHARD VALENZUELA, CESAR ABARCA, CESAR MOEDANO, JAVIER CASTRELLON, DEMITRO CONTRERAS, GUILLERMO REYES, JOSHUA CRUZ and MARTIN REYES are "Surenos," that is, they are members of various Southern California Hispanic street gangs. They act as Mexican Mafia "affiliates" or "soldiers," who take directions from Mexican Mafia members and associates, and who are responsible for conducting the day-to-day business of the Mexican Mafia, including, but not limited to, murder, assault, distributing narcotics, extortion and money laundering.

h. Defendants JESUS ANTONIO ARMENTA, EDNA DAVILA, MARY LOU VEGA and ANGELA ESPARZA are Mexican Mafia facilitators who conduct some of the day-to-day operations of the Mexican Mafia, including distributing narcotics and money laundering. Those individuals also promote the activities of the Mexican Mafia by transmitting messages between Mexican Mafia members, associates and affiliates.

**THE PATTERN OF RACKETEERING**

18. The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5) consisted of the following acts:

Racketeering Act No. 1
(Attempted Murder of Correctional Officer M.E. Jamison)

On or about November 9, 1986, within the Northern District of California, defendant RAUL LEON did knowingly and intentionally aid, abet, advise, encourage and otherwise willfully participate in the attempted murder of San Quentin State Prison Correctional Officer M.E. Jamison, knowing or having reason to know that M.E. Jamison was a

State Correctional Offer engaged in the performance of his official duties; in violation of California Penal Code Sections 21a, 31 and 664/187(a).

Racketeering Act No. 2
(Conspiracy To Distribute Controlled Substances)

Beginning at a date unknown to the grand jury, and continuing up to and including June 6, 2006, within the Southern District of California, and elsewhere, defendants RAUL LEON, JUVENAL VEGA-SOTO, RICARDO MARTINEZ, EDUARDO GONZALEZ-GALLEGOS, GEORGE FERNANDEZ, THOMAS DURKIN, JESSIE MUNOZ, SALVADOR PEREZ, DEMITRO CONTRERAS, GUILLERMO REYES, JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, EDNA DAVILA, MARY LOU VEGA and ANGELA ESPARZA did knowingly and intentionally conspire with each other, and with other persons known and unknown to the grand jury, to distribute a controlled substance, to wit, 50 grams and more of methamphetamine, and 5 kilograms and more of cocaine, both Schedule II Controlled Substances, and 100 grams and more of heroin, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Racketeering Act No. 3
(Conspiracy To Launder Drug Proceeds)

Beginning at a date unknown to the grand jury, but no later than in or about 1992, and continuing up to and including June 6, 2006, within the Southern District of California, and elsewhere, defendants RAUL LEON, JUVENAL VEGA-SOTO, RICARDO MARTINEZ, EDUARDO GONZALEZ-GALLEGOS, THOMAS DURKIN, ALEX GOMEZ, JESSIE MUNOZ, JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, EDNA DAVILA, MARY LOU VEGA and ANGELA ESPARZA did knowingly and intentionally conspire with each other, and with other persons known and unknown to the grand jury, to:

a. conduct a financial transaction affecting interstate commerce, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, which in fact involved the proceeds of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance, punishable under the laws of the United States: (1) with the intent to promote the carrying on of specified unlawful activity; and (2) knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control, of the proceeds of specified unlawful activity; and

b. transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United states from and through a place outside the United States: (1) with the intent to promote the carrying on of specified unlawful activity; and (2) knowing that the monetary instruments or funds involved in the transportation, transmission or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control, of the proceeds of specified unlawful activity; in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2)(A) and 1956(a)(2)(B)(i);

All in violation of Title 18, United States Code, Section 1956(h).

//

//

Racketeering Act No. 4
(Conspiracy To Import Controlled Substances)

Beginning at a date unknown to the grand jury, and continuing up to and including June 6, 2006, within the Southern District of California and elsewhere, defendants JUVENAL VEGA-SOTO, RICARDO MARTINEZ, THOMAS DURKIN, JESSIE MUNOZ, CESAR MOEDANO, JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, MARY LOU VEGA and ANGELA ESPARZA did knowingly and intentionally conspire with each other, and with other persons known and unknown to the grand jury, to import a controlled substance, to wit, 50 grams and more of methamphetamine and 5 kilograms and more of cocaine, both Schedule II Controlled Substances, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952, 960 and 963.

Racketeering Act No. 5
(Conspiracy To Interfere With Commerce Through Threats Of Violence)

Beginning at a date unknown to the grand jury, but no later than in or about 1998, and continuing up to and including June 6, 2006, within the Southern District of California and elsewhere, defendants THOMAS DURKIN, ALEX GOMEZ, JESSIE MUNOZ, CESAR MOEDANO, JAVIER CASTRELLON, DEMITRO CONTRERAS and others known and unknown to the grand jury, did knowingly and intentionally conspire to unlawfully, knowingly and willfully obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce as defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in commerce, by extortion, as defined in Title 18, United States Code, Section 1951, in that the defendants, and others, did obtain and attempt to obtain the property of individuals engaged in unlawful drug distribution, with their consent, having been induced

by the wrongful use of actual and threatened force, violence or fear, in that the defendants, and others, wrongfully threatened and assaulted drug distributors operating within territories controlled by the Mexican Mafia, including the San Diego, Encinitas, Oceanside, San Marcos, Escondido and Valley Center areas of California, to induce the payment of a "tax" or fee on drug profits; in violation of Title 18, United States Code, Section 1951.

<u>Racketeering Act No. 6</u>
(Possession With Intent To Distribute PCP)

On or about December 11, 1991, within the Southern District of California, defendant EDUARDO GONZALEZ-GALLEGOS did knowingly and intentionally possess, with intent to distribute, 10 grams and more of phencyclidine (PCP), a Schedule III Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 7</u>
(Conspiracy To Murder Jabila Barragan)
(Murder Of Jabila Barragan)

The defendants named below committed the following acts involving murder, either one of which constitutes the commission of Racketeering Act 7:

a. Beginning at a date unknown to the grand jury and continuing up to and including June 24, 2002, within the Eastern District of California and elsewhere, defendants RAUL LEON, SALVADOR PEREZ, RICHARD VALENZUELA and CESAR ABARCA conspired to murder Jabila Barragan, a human being, and a co-conspirator committed an overt act in furtherance of the conspiracy, in violation of California Penal Code Sections 182 and 187(a).

//

//

b. On or about June 24, 2002, within the Eastern District of California and elsewhere, defendants RAUL LEON, SALVADOR PEREZ, RICHARD VALENZUELA and CESAR ABARCA, unlawfully with malice aforethought did aid, abet, advise, encourage and otherwise willfully participate in the murder of Jabila Barragan, a human being; in violation of California Penal Code Sections 31 and 187(a).

<u>Racketeering Act No. 8</u>
(Possession With Intent To Distribute Methamphetamine)

On or about July 20, 2004, within the Central District of California, defendants MARY LOU VEGA and ANGELA ESPARZA did knowingly and intentionally possess, with intent to distribute, 50 grams and more of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code Section 841(a)(1), and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 9</u>
(Robbery of Drug Dealer in Encinitas)

On or about January 14, 2005, within the Southern District of California, defendant DEMITRO CONTRERAS did unlawfully and by means of force and fear take personal property from the person, possession and immediate presence of a drug dealer in Encinitas, California; in violation of California Penal Code Section 211.

<u>Racketeering Act No. 10</u>
(Distribution Of Methamphetamine)

In or about March 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 14 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 11</u>
(Distribution Of Methamphetamine)

In or about March 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 14 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 12</u>
(Distribution of Methamphetamine)

In or about April 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 28 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 13</u>
(Distribution of Methamphetamine)

On or about April 11, 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 84 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 14</u>
(Distribution of Methamphetamine)

In or about April 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 112 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 15
(Distribution of Methamphetamine)

On or about June 30, 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 224 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 16
(Conspiracy To Murder of Alvaro Hernandez, aka Toro)
(Murder of Alvaro Hernandez, aka Toro)

The defendants named below committed the following acts involving murder, either one of which constitutes the commission of Racketeering Act 16:

a. Beginning at a date unknown to the grand jury and continuing up to and including July 28, 2005, within the Southern District of California and elsewhere, defendants JUVENAL VEGA-SOTO, RICARDO MARTINEZ, EDUARDO GONZALEZ-GALLEGOS, GEORGE FERNANDEZ, THOMAS DURKIN, JESSIE MUNOZ and JOSHUA CRUZ conspired to murder Alvaro Hernandez, a human being, and a co-conspirator committed an overt act in furtherance of the conspiracy, in violation of California Penal Code Sections 182 and 187(a).

b. On or about July 28, 2005, within the Southern District of California and elsewhere, defendants JUVENAL VEGA-SOTO, RICARDO MARTINEZ, EDUARDO GONZALEZ-GALLEGOS, GEORGE FERNANDEZ, THOMAS DURKIN, JESSIE MUNOZ and JOSHUA CRUZ, unlawfully with malice aforethought did aid, abet, advise, encourage and otherwise willfully participate in the murder of Alvaro Hernandez, a human being; in violation of California Penal Code Sections 31 and 187(a).

//

Racketeering Act No. 17
(Distribution Of Heroin)

On or about August 2, 2005, within the Southern District of California, defendant THOMAS DURKIN did knowingly and intentionally distribute approximately 25 grams of heroin, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 18
(Possession With Intent To Distribute Heroin)

On or about August 2, 2005, within the Southern District of California and elsewhere, defendant EDNA DAVILA did knowingly and intentionally possess, with intent to distribute, approximately 25 grams of heroin, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 19
(Distribution Of Methamphetamine)

On or about August 7, 2005, within the Southern District of California, defendants EDUARDO GONZALEZ-GALLEGOS and GUILLERMO REYES did knowingly and intentionally distribute approximately 28 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Racketeering Act No. 20
(Possession With Intent To Distribute Methamphetamine)

On or about August 7, 2005, within the Southern District of California, defendant THOMAS DURKIN did knowingly and intentionally possess, with intent to distribute, approximately 28 grams of

//

methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 21
(Distribution Of Methamphetamine)

On or about August 15, 2005, within the Southern District of California, defendants EDUARDO GONZALEZ-GALLEGOS and GUILLERMO REYES did knowingly and intentionally distribute approximately 55 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

Racketeering Act No. 22
(Possession With Intent To Distribute Methamphetamine)

On or about August 15, 2005, within the Southern District of California, defendant THOMAS DURKIN did knowingly and intentionally possess, with intent to distribute, approximately 55 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 23
(Distribution Of Methamphetamine)

On or about August 18, 2005, within the Central District of California, defendants JUVENAL VEGA-SOTO, ANGELA ESPARZA and others known and unknown to the grand jury, did knowingly and intentionally distribute approximately 450 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

//

//

//

Racketeering Act No. 24
(Distribution Of Methamphetamine)

On or about August 18, 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally distribute approximately 450 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 25
(Possession With Intent To Distribute Methamphetamine)

On or about August 31, 2005, within the Southern District of California, defendant JESSIE MUNOZ did knowingly and intentionally possess, with intent to distribute, approximately 226 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 26
(Distribution Of Methamphetamine)

On or about September 9, 2005, within the Southern District of California, defendant GEORGE FERNANDEZ did knowingly and intentionally distribute approximately 113 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act No. 27
(Distribution Of Methamphetamine)

On or about September 28, 2005, within the Southern District of California, defendant GEORGE FERNANDEZ did knowingly and intentionally distribute approximately 113 grams of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act No. 28</u>
(Importation Of Methamphetamine)

On or about October 27, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, MARY LOU VEGA, ANGELA ESPARZA and others known and unknown to the grand jury, did knowingly and intentionally import approximately 21 pounds of methamphetamine, a Schedule II Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 29</u>
(Distribution of Methamphetamine)

On or about October 27, 2005, within the Central District of California, defendants JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, MARY LOU VEGA, ANGELA ESPARZA, and others known and unknown to the grand jury, did knowingly and intentionally possess, with intent to distribute, approximately 21 pounds of methamphetamine, a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 30</u>
(Laundering Drug Proceeds)

On or about November 1, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, JESUS ANTONIO ARMENTA, MARTIN REYES, and others known and unknown to the grand jury, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit, approximately $71,000 in United States currency, from a place in the United States to and through a place outside the United States: (1) with the intent to promote the carrying

on of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance, punishable under the laws of the United States; and (2) knowing that the monetary instruments or funds involved in the transportation, transmission or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control, of the proceeds of specified unlawful activity; in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(a)(2)(B)(i), and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 31</u>
(Importation Of Methamphetamine)

On or about November 3, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, JESUS ANTONIO ARMENTA and others known and unknown to the grand jury, did knowingly and intentionally import approximately 5 pounds of methamphetamine, a Schedule II Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 32</u>
(Laundering Drug Proceeds)

On or about November 7, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, ROBERT ROMERO, MARTIN REYES, MARY LOU VEGA, and others known and unknown to the grand jury, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit, approximately $41,000 in United States

currency, from a place in the United States to and through a place outside the United States: (1) with the intent to promote the carrying on of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance, punishable under the laws of the United States; and (2) knowing that the monetary instruments or funds involved in the transportation, transmission or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control, of the proceeds of specified unlawful activity; in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(a)(2)(B)(i), and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 33</u>
(Laundering Drug Proceeds)

On or about November 9, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, JESSIE MUNOZ, JESUS ANTONIO ARMENTA, and others known and unknown to the grand jury, did knowingly and intentionally transport, transmit, and transfer monetary instruments and funds, to wit, approximately $3,000 in United States currency, from a place in the United States to and through a place outside the United States: (1) with the intent to promote the carrying on of specified unlawful activity, that is, the felonious manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in a controlled substance, punishable under the laws of the United States; and (2) knowing that the monetary instruments or funds involved in the transportation, transmission or transfer represent the

proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control, of the proceeds of specified unlawful activity; in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 1956(a)(2)(B)(i), and Title 18, United States Code, Section 2.

<u>Racketeering Act No. 34</u>
(Importation Of Methamphetamine)

On or about November 16, 2005, within the Southern District of California, defendants JUVENAL VEGA-SOTO, JESUS ANTONIO ARMENTA, ROBERT ROMERO, MARTIN REYES, MARY LOU VEGA, ANGELA ESPARZA and others known and unknown to the grand jury, did knowingly and intentionally import approximately 13 pounds of methamphetamine, a Schedule II Controlled Substance, into the United States from a place outside thereof; in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2.

**<u>OVERT ACTS</u>**

19. In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the defendants and their co-conspirators committed the following overt acts, among others, in San Diego County, within the Southern District of California, unless otherwise specified, on or about the dates set forth below:

(1) On or about November 9, 1986, within the Northern District of California, defendant RAUL LEON possessed a homemade weapon, also known as a "shank," within the San Quentin State Prison.

//

(2) On or about November 9, 1986, within the Northern District of California, defendant RAUL LEON attempted to murder Corrections Officer M.E. Jamison by stabbing him in the head with a homemade knife, also known as a "shank."

(3) On or about October 21, 1991, defendant EDUARDO GONZALEZ-GALLEGOS possessed, with intent to distribute, approximately 25 milliliters of phencyclidine (PCP).

(4) On or about February 10, 1992, within the Central District of California, defendant JUVENAL VEGA-SOTO possessed approximately $13,000 in United States currency.

(5) On or about February 15, 1992, defendant RICARDO MARTINEZ possessed, with intent to distribute, approximately 863.8 grams of methamphetamine.

(6) On or about March 11, 1992, within the Northern District of California, and elsewhere, Mexican Mafia member Ruben Hernandez (charged elsewhere) sent a letter from Pelican Bay State Prison to "Kenario Garcia" (defendant JUVENAL VEGA-SOTO), wherein Hernandez stated that he would contact "Tor" (Mexican Mafia member Ronald Baisa, aka Tortuga) in order to make sure that the individual(s) responsible for the law enforcement seizure of $13,000 on or about February 10, 1992, reimbursed VEGA for that loss.

(7) On or about March 17, 1992, within the Central District of California, and elsewhere, defendant

JUVENAL VEGA-SOTO, using the alias "Kenario Garcia," sent a letter from Ontario, California, to Mexican Mafia member Ruben Hernandez (charged elsewhere) at Pelican Bay State Prison, wherein VEGA stated that had the $13,000 not been seized by law enforcement, he would have put some of that money on "the books," that is, the inmate accounts, of Mexican Mafia members Ruben Hernandez and Daryl Castrejon (charged elsewhere).

(8) On or about March 17, 1992, within the Central District of California, and elsewhere, defendant JUVENAL VEGA-SOTO, using the alias "Kenario Garcia," sent a letter from Ontario, California, to Mexican Mafia member Ruben Hernandez (charged elsewhere) at Pelican Bay State Prison, wherein VEGA updated Hernandez on VEGA's ongoing efforts to manufacture and distribute methamphetamine.

(9) On or about March 18, 1992, within the Central District of California and elsewhere, defendant JUVENAL VEGA-SOTO, using the alias "Kenario Garcia," sent a letter from Ontario, California, to Mexican Mafia member Darryl Castrejon (charged elsewhere) at Pelican Bay State Prison, wherein VEGA stated that he would share the profits of his methamphetamine manufacturing and distribution activities with Castrejon, and others.

(10) On or about September 21, 1993, within the Central District of California, and elsewhere, defendant

EDUARDO GONZALEZ-GALLEGOS, using the alias "The Young Stud," sent a letter from United States Penitentiary (USP) Lompoc to defendant THOMAS DURKIN at the Metropolitan Correctional Center (MCC) in San Diego, California, through a third-party mail drop in the Southern District of California, wherein GONZALEZ stated that he was working on behalf of the Mexican Mafia.

(11) On or about September 21, 1993, within the Central District of California, and elsewhere, defendant EDUARDO GONZALEZ-GALLEGOS, using the alias "The Young Stud," sent a letter from USP Lompoc to defendant THOMAS DURKIN at the MCC San Diego, through a third-party mail drop in the Southern District of California, wherein GONZALEZ stated that he had been sponsored for membership in the Mexican Mafia.

(12) On or about July 4, 1995, within the Central District of California, and elsewhere, defendant THOMAS DURKIN, using the alias "Tommy Plichta," sent a letter from Federal Correctional Institute (FCI) Phoenix to defendant EDUARDO GONZALEZ-GALLEGOS at USP Lompoc, through a third-party mail drop in the Southern District of California, wherein DURKIN requested information from GONZALEZ regarding the identity of the individual(s) cooperating with the Government in the recent Racketeer Influence Corrupt Organization (RICO) prosecution against Mexican Mafia members in Los Angeles.

(13) On or about September 21, 1995, within the Central District of California, defendant EDUARDO GONZALEZ-GALLEGOS possessed an address book which contained the names, phone numbers, addresses and third-party mail drop locations for various Mexican Mafia members and associates, including defendants THOMAS DURKIN and RICARDO MARTINEZ.

(14) Between April and August 1998, defendant ALEX GOMEZ, Mexican Mafia member Frank Madriaga, aka Chino (charged elsewhere), Roger Sanborn (charged elsewhere), assaulted an individual and killed that individual's dog.

(15) Between April and August 1998, Mexican Mafia member Frank Madriaga (charged elsewhere) authorized defendant ALEX GOMEZ to "tax" individuals in North San Diego County on behalf of the Mexican Mafia.

(16) On or about February 24, 2001, defendant RICARDO VALENZUELA used a homemade knife, also known as a "shank," to assault an inmate at Calipatria State Prison.

(17) In or about June 2002, within the Eastern District of California, defendant SALVADOR PEREZ exercised control, on behalf of the Mexican Mafia, over the "main line" and the "yard" (areas accessible to all inmates) at the High Desert California State Prison.

(18) In or about June 2002, within the Northern District of California, and elsewhere, defendant RAUL LEON caused one or more letter(s) to be written and sent from

Pelican Bay State Prison to defendant SALVADOR PEREZ, wherein LEON ordered the murder of High Desert California State Prison inmate Jabila Barragan.

(19) In or about June 2002, within the Eastern District of California, defendant SALVADOR PEREZ recruited defendants RICHARD VALENZUELA and CESAR ABARCA to murder inmate Jabila Barragan.

(20) On or about June 24, 2002, within the Eastern District of California, defendants RICHARD VALENZUELA and CESAR ABARCA possessed a homemade knife, also known as a "shank."

(21) On or about June 24, 2002, within the Eastern District of California, defendants RICHARD VALENZUELA and CESAR ABARCA stabbed inmate Jabila Barragan to death.

(22) On or about July 25, 2002, within the Northern District of California, defendant RAUL LEON transferred $8,000 from his inmate trust account at Pelican Bay State Prison to an individual in San Diego as a payment for narcotics, some of which were to be smuggled into the California State Prison system.

(23) On or about April 14, 2003, within the Northern District of California, defendant RAUL LEON informed a fellow inmate that in regard to the murder of High Desert State Prison Inmate Jabila Barragan, "I had his ass killed."

//

//

//

(24) On or about July 20, 2004, within the Central District of California, defendants MARY LOU VEGA and ANGELA ESPARZA possessed, with intent to distribute, approximately 2 pounds of methamphetamine.

(25) On or about July 20, 2004, within the Central District of California, defendants MARY LOU VEGA and ANGELA ESPARZA possessed 4 handguns, 1 shotgun and $23,760 in United States currency.

(26) In or about September 2004, within the Northen District of California, defendant RAUL LEON possessed approximately $21,777 United States currency in his inmate trust account at Pelican Bay State Prison.

(27) On or about September 1, 2004, defendant JESSIE MUNOZ informed the girlfriend of Mexican Mafia member Richard Buchanan (charged elsewhere) that he MUNOZ was involved in selling narcotics and "taxing" other drug traffickers on behalf of the Mexican Mafia.

(28) On or about September 1, 2004, defendant JESSIE MUNOZ explained to the girlfriend of Mexican Mafia member Richard Buchanan (charged elsewhere) that MUNOZ was responsible for making payments to incarcerated Mexican Mafia members.

(29) On or about September 1, 2004, defendant JESSIE MUNOZ informed the girlfriend of Mexican Mafia member Richard Buchanan (charged elsewhere)that MUNOZ was obtaining narcotics from defendant JUVENAL VEGA-SOTO.

//

//

(30) On or about September 16, 2004, defendant GEORGE FERNANDEZ sent a letter to defendant RAUL LEON at Pelican Bay State Prison, wherein FERNANDEZ provided LEON with the names of three new Mexican Mafia members and the identities of the Mexican Mafia members who sponsored those new members.

(31) On or about October 14, 2004, within the Central District of California, and elsewhere, Mexican Mafia member Thomas Moreno (charged elsewhere) sent a letter from FCI Victorville to defendant EDNA DAVILA, wherein Moreno referred to defendant ROBERT ROMERO as "our homie Bobby Norwalk," thereby confirming ROMERO's status as a member of the Mexican Mafia.

(32) On or about December 12, 2004, defendant GEORGE FERNANDEZ sent a letter, through a third-party mail drop, to Mexican Mafia member Reynaldo Ayala (charged elsewhere) at San Quentin State Prison, wherein FERNANDEZ requested that Ayala join with other Mexican Mafia members who had already sponsored FERNANDEZ for membership in the Mexican Mafia, so as to enable FERNANDEZ to "unite the neighborhoods in San Diego."

(33) On or about December 12, 2004, defendant GEORGE FERNANDEZ sent a letter, through a third-party mail drop, to Mexican Mafia member Reynaldo Ayala at San Quentin State Prison, wherein FERNANDEZ admitted that he was working for Mexican Mafia member Richard Buchanan (charged elsewhere).

//

(34) On or about December 30, 2004, defendant ALEX GOMEZ, working on behalf of the Mexican Mafia, collected a "tax" payment from the narcotics distributors using a house in Oceanside, California.

(35) On or about January 4, 2005, defendant JUVENAL VEGA-SOTO sent a money order in the amount of $100 United States currency to Mexican Mafia member Jessie Moreno (charged elsewhere) at USP Marion.

(36) On or about January 6, 2005, defendant ALEX GOMEZ informed an individual that he was a member of the Mexican Mafia.

(37) On or about January 14, 2005, defendant DEMITRO CONTRERAS robbed and battered an individual selling narcotics in Encinitas.

(38) On or about January 26, 2005, defendant THOMAS DURKIN informed Escondido Santos gang member Teddy Morales (charged elsewhere) that the "keys" (Mexican Mafia-sanctioned control) for the Vista Detention Facility had been given to "Shorty" (Escondido gang member Miguel Lopez, charged elsewhere), not to "Ozzy" (Posole gang member Oswaldo Terriquez, charged elsewhere).

(39) On January 26, 2005, defendant THOMAS DURKIN gave Escondido Santos gang member Teddy Morales (charged elsewhere) permission to assault Oswaldo Terriquez (charged elsewhere), who was falsely claiming to have Mexican Mafia-sanctioned control over the Vista Detention facility.

(40) On or about February 14, 2005, within the Northern District of California, defendant RAUL LEON sent a letter from Pelican Bay State Prison to defendant GEORGE FERNANDEZ, wherein LEON stated that he hoped FERNANDEZ was "still working hard to take care of the family," that is, working hard to generate money for members of the Mexican Mafia.

(41) In or about February or March 2005, defendant DEMITRO CONTRERAS, and others, collected a "tax" payment from an individual selling narcotics in Encinitas, California.

(42) In or about February or March 2005, defendant JAVIER CASTRELLON, and others, collected a "tax" payment from an individual selling narcotics in Encinitas, California.

(43) In or about March 2005, defendant DEMITRO CONTRERAS, and others, robbed an individual selling narcotics in Encinitas, California.

(44) In or about March 2005, defendant JESSIE MUNOZ distributed approximately 14 grams of methamphetamine.

(45) In or about March 2005, defendant JESSIE MUNOZ distributed approximately 14 grams of methamphetamine.

(46) On or about March 19, 2005, defendant THOMAS DURKIN informed defendant RICARDO MARTINEZ that defendant ALEX GOMEZ was collecting "taxes" on behalf of the Mexican Mafia in the Sherman Heights neighborhood of San Diego.

//

(47) On or about March 19, 2005, defendant THOMAS DURKIN informed defendant RICARDO MARTINEZ that defendant JUVENAL VEGA-SOTO had offered to supply heroin to DURKIN and defendants JESSIE MUNOZ and EDUARDO GONZALEZ-GALLEGOS.

(48) On or about March 30, 2005, defendant EDNA DAVILA sent a money order in the amount of $400 United States currency to defendant RICARDO MARTINEZ at USP Victorville.

(49) In or about April 2005, defendant EDUARDO GONZALEZ instructed Logan Heights Red Steps gang member Mario Vallejo, aka Wizard (charged elsewhere), to send a money order in the amount of $100 United States currency to defendant RICARDO MARTINEZ at USP Victorville.

(50) In or about April 2005, defendant JESSIE MUNOZ distributed approximately 112 grams of methamphetamine.

(51) On or about April 1, 2005, defendant GEORGE FERNANDEZ sent a letter to defendant RAUL LEON at Pelican Bay State Prison, wherein FERNANDEZ informed LEON that Pete Garcia, aka Peligroso (charged elsewhere), was claiming to be a member of the Mexican Mafia and that Garcia was interfering with FERNANDEZ' "construction company," that is, Fernandez' "taxing" activities on behalf of the Mexican Mafia.

(52) On or about April 11, 2005, defendant JESSIE MUNOZ distributed approximately 84 grams of methamphetamine.

(53) On or about April 29, 2005, defendant EDUARDO GONZALEZ sent a money order in the amount of $50 United States currency to defendant RICARDO MARTINEZ at FCI Victorville.

(54) In or about May 2005, defendant EDUARDO GONZALEZ instructed Logan Heights Red Steps gang member Mario Vallejo, aka Wizard (charged elsewhere), to send a money order in the amount of $100 United States currency to defendant RICARDO MARTINEZ at USP Victorville.

(55) On or about May 2, 2005, defendant EDUARDO GONZALEZ sent a money order in the amount of $50 United States currency to defendant RICARDO MARTINEZ at USP Victorville.

(56) On or about May 7, 2005, defendant DEMITRO CONTRERAS asked defendant THOMAS DURKIN to provide him with "4 grams" of drugs; CONTRERAS instructed DURKIN to "balloon up" the drugs and give them to a female, who would then smuggle the drugs into the George Bailey Detention Facility.

(57) On or about June 2, 2005, defendant THOMAS DURKIN, writing on behalf of defendant EDUARDO GONZALEZ, sent a postcard to defendant RICARDO MARTINEZ at USP Victorville, wherein DURKIN informed MARTINEZ that MARTINEZ needed to contact USP Marion inmate and Mexican Mafia member Raymond Mendez, aka O.C. Champ (charged elsewhere), to determine whether or not Mendez had given Alvaro Hernandez, aka Toro, the

authority to "tax" individuals in San Diego on behalf of the Mexican Mafia.

(58) On or about June 4, 2005, defendant THOMAS DURKIN sent a letter to USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere), wherein DURKIN informed Barela that Alvaro Hernandez was "taxing" individuals on behalf of the Mexican Mafia.

(59) On or about June 4, 2005, defendant THOMAS DURKIN sent a letter to USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere), wherein DURKIN asked if Barela had received a $50 payment from defendant EDUARDO GONZALEZ.

(60) On or about June 11, 2005, defendant JESSIE MUNOZ, acting on behalf of the Mexican Mafia, gave Vista Homeboys gang members Frankie Fierro (charged elsewhere) and Johnny Hernandez (charged elsewhere) the "keys" (Mexican Mafia-sanctioned control) to Vista, California.

(61) On or about June 11, 2005, USP Leavenworth inmate and Mexican Mafia member Frank Madriaga (charged elsewhere) instructed defendant JESSIE MUNOZ to send him some "black shoes," that is, heroin.

(62) On or about June 12, 2005, defendant JESSIE MUNOZ gave defendant CESAR MOEDANO detailed instructions on who to "tax," and how much to "tax" those individuals.

(63) On or about June 12, 2005, defendant JUVENAL VEGA-SOTO informed USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere) that VEGA spoke with

defendant EDUARDO GONZALEZ-GALLEGOS about a problem that GONZALEZ was having with Alvaro Hernandez.

(64) On or about June 12, 2005, defendant JUVENAL VEGA-SOTO and USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere) discussed the possibility of having Mexican Mafia member Frankie Buelna killed; regarding the murder of Buelna, VEGA stated that defendant JESSIE MUNOZ had a "homie who raised his hand," that is, an individual who volunteered to commit the murder, but that MUNOZ wanted to first make sure that the murder was properly sanctioned by a Mexican Mafia member.

(65) On or about June 12, 2005, defendant JUVENAL VEGA-SOTO informed USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere) that VEGA had given defendant ROBERT ROMERO narcotics to distribute.

(66) On or about June 13, 2005, a drug distributor being supplied by defendant JESSIE MUNOZ informed MUNOZ that he (the drug distributor) had sold the 6 ounces of "soda," that is, cocaine, which MUNOZ had given him.

(67) On or abut June 13, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ agreed that they would give DEMITRO CONTRERAS the task of assaulting a convicted sex offender who had recently returned to San Diego.

(68) On or about June 14, 2005, defendant CESAR MOEDANO informed defendant JESSIE MUNOZ that there was a "white guy" in the neighborhood selling drugs who refused to "pay up."

(69) On or about June 14, 2005, defendant CESAR MOEDANO asked defendant JESSIE MUNOZ for guidance on how to handle the "white guy" who refused to pay "taxes."

(70) On or about June 17, 2005, defendant CESAR MOEDANO made arrangements to provide defendant JESSIE MUNOZ with "taxes" that MOEDANO, and gang members operating under MOEDANO's supervision, had collected on behalf of the Mexican Mafia.

(71) On or about June 18, 2005, defendant CESAR MOEDANO provided defendant JESSIE MUNOZ with "taxes" collected on behalf of the Mexican Mafia.

(72) On or about June 28, 2005, defendant EDUARDO GONZALEZ-GALLEGOS instructed Logan Heights Red Steps gang member Mario Vallejo, aka Wizard (charged elsewhere), to send a money order in the amount of $200 United States currency to defendant RICARDO MARTINEZ at USP Victorville.

(73) On or about June 28, 2005, defendant JESSIE MUNOZ informed Richard Jaime, aka Chato (charged elsewhere), that he had a "whole one," that is, a full pound of methamphetamine for sale.

(74) On or about June 30, 2005, defendant JESSIE MUNOZ sold approximately a half-pound of methamphetamine to Richard Jaime, aka Chato (charged elsewhere).

(75) On or about July 1, 2005, defendant JESSIE MUNOZ informed Miguel LNU that unless Miguel's son, Eric, paid a Mexican Mafia debt owed to "Spooky" from East Los Angeles, Eric would be assaulted by Mexican Mafia

members/associates/affiliates, if Eric ever got sent back to prison.

(76) On or about July 1, 2005, Richard Jaime, aka Chato (charged elsewhere), paid defendant JESSIE MUNOZ approximately $7,000.

(77) On or about July 2, 2005, defendant JESSIE MUNOZ instructed an individual to deliver $7,000, as payment for 1 pound of methamphetamine, to defendant ANGELA ESPARZA.

(78) On or about July 2, 2005, within the Central District of California, defendant ANGELA ESPARZA possessed $7,000 in United States currency.

(79) On or about July 5, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ discussed the developing and escalating problem between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez, who was collecting "taxes," using the authority of the Mexican Mafia; DURKIN instructed MUNOZ to contact defendant JUVENAL VEGA-SOTO and enlist VEGA's assistance in resolving the dispute.

(80) On or about July 6, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ discussed arranging either a meeting or a three-way call with defendants EDUARDO GONZALEZ-GALLEGOS and JUVENAL VEGA-SOTO to enlist VEGA's assistance in resolving a dispute between GONZALEZ and Alvaro Hernandez.

//

//

(81) On or about July 8, 2005, defendant THOMAS DURKIN sent a letter to San Quentin State Prison inmate and Mexican Mafia member Reynaldo Ayala (charged elsewhere), wherein DURKIN informed Ayala that defendant EDUARDO GONZALEZ-GALLEGOS was "bumping heads" with Alvaro Hernandez, who DURKIN referred to as "some jerk from the East Side."

(82) On or about July 8, 2005, defendant THOMAS DURKIN sent a letter to San Quentin State Prison inmate and Mexican Mafia member Reynaldo Ayala (charged elsewhere), wherein DURKIN asked Ayala for his support, the support of defendant RICARDO MARTINEZ, and the support of other Mexican Mafia members, in resolving the dispute between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez.

(83) On or about July 8, 2005, defendant THOMAS DURKIN sent a letter to defendant RICARDO MARTINEZ at USP Victorville, wherein DURKIN informed MARTINEZ about the problem defendant EDUARDO GONZALEZ-GALLEGOS was having with Alvaro Hernandez; DURKIN asked for MARTINEZ' support in resolving the dispute.

(84) On or about July 9, 2005, defendant JESSIE MUNOZ agreed to pay Javier Cortez Medina (charged elsewhere) $3,500 for a half-pound of methamphetamine.

(85) On or about July 9, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ discussed the escalating problem between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez; regarding that problem, DURKIN stated that

Hernandez was acting beyond his authority by "having guys beat up" and "having guys moved-on," that is, having people "taxed."

(86) On or about July 9, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ discussed the escalating problem between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez; regarding that problem, DURKIN expressed concern that GONZALEZ was going to "go off into Rambo shit" and take care of the problem himself.

(87) On or about July 12, 2005, defendant THOMAS DURKIN and USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere) discussed the escalating problem between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez; regarding that problem, Barela gave his backing to GONZALEZ to handle the problem.

(88) On or about July 12, 2005, defendant THOMAS DURKIN and USP Lewisburg inmate and Mexican Mafia member Daniel Barela (charged elsewhere) discussed the escalating problem between defendant EDUARDO GONZALEZ-GALLEGOS and Alvaro Hernandez; regarding that problem, Barela advised DURKIN to contact Mexican Mafia member Raymond Mendez (charged elsewhere) to confirm that Alvaro Hernandez was not working on Mendez' behalf.

(89) On or about July 15, 2005, defendant EDUARDO GONZALEZ-GALLEGOS, using the alias "Mike Bibby," sent a letter to USP Marion inmate and Mexican Mafia member Raymond Mendez (charged elsewhere), wherein GONZALEZ asked whether Alvaro Hernandez was working for Mendez.

(90) On or about July 20, 2005, USP Marion inmate and Mexican Mafia member Raymond Mendez (charged elsewhere) sent a letter to defendant EDUARDO GONZALEZ-GALLEGOS, wherein Mendez stated that he had never heard of Alvaro Hernandez and that Hernandez was not working for him in San Diego.

(91) On or about July 20, 2005, defendant EDUARDO GONZALEZ-GALLEGOS sent a letter to San Quentin State Prison inmate and Mexican Mafia member Reynaldo Ayala (charged elsewhere), wherein GONZALEZ complained to Ayala that Alvaro Hernandez was "taxing" on behalf of Mexican Mafia member Raymond Mendez (charged elsewhere), and that none of the "tax" money was being sent to Mexican Mafia members from San Diego.

(92) On or about July 20, 2005, defendant EDUARDO GONZALEZ-GALLEGOS sent San Quentin State Prison inmate and Mexican Mafia member Reynaldo Ayala (charged elsewhere) a money order in the amount of $100 United States currency, along with a letter.

(93) On or about July 22, 2005, defendants THOMAS DURKIN, EDUARDO GONZALEZ-GALLEGOS and GEORGE FERNANDEZ attended a meeting in Chula Vista, California, to discuss how to deal with the problems being created by Alvaro Hernandez.

(94) On or about July 22, 2005, defendant THOMAS DURKIN ordered a quantity of methamphetamine from defendant GEORGE FERNANDEZ.

//

(95) On or about July 24, 2005, defendant THOMAS DURKIN informed defendant EDUARDO GONZALEZ-GALLEGOS that he had not heard from either defendant JUVENAL VEGA-SOTO or defendant GEORGE FERNANDEZ regarding the Alvaro Hernandez problem.

(96) On or about July 24, 2005, a narcotics distributor ordered 6 or 7 kilograms of cocaine from defendant JESSIE MUNOZ.

(97) On or about July 25, 2005, defendant JESSIE MUNOZ informed defendant JUVENAL VEGA-SOTO that he (MUNOZ) had customers who needed 6 or 7 kilograms of cocaine; VEGA referred MUNOZ to the "Engineer," who VEGA stated would be able to provide MUNOZ with the requested cocaine.

(98) On or about July 25, 2005, defendant JESSIE MUNOZ informed defendant THOMAS DURKIN that defendant JUVENAL VEGA-SOTO was going to send Mexican Mafia member Joseph Carbajal, aka Chapulin (charged elsewhere), to San Diego to meet with DURKIN, MUNOZ and defendant EDUARDO GONZALEZ-GALLEGOS regarding the problem GONZALEZ was having with Alvaro Hernandez.

(99) On or about July 25, 2005, defendant JESSIE MUNOZ arranged to provide defendant JUVENAL VEGA-SOTO with a telephone number for defendant EDUARDO GONZALEZ-GALLEGOS, so that VEGA could give GONZALEZ' number to Mexican Mafia member Joseph Carbajal (charged elsewhere), who VEGA was sending to San Diego to help "solve the problem" with Alvaro Hernandez.

(100) On or about July 25, 2005, defendant GEORGE FERNANDEZ met with defendant THOMAS DURKIN to discuss the problem defendant EDUARDO GONZALEZ-GALLEGOS was having with Alvaro Hernandez.

(101) On or about July 26, 2005, defendant THOMAS DURKIN informed defendant EDUARDO GONZALEZ-GALLEGOS that defendant GEORGE FERNANDEZ had just left and that DURKIN had some important news to share with GONZALEZ, but that DURKIN was not comfortable discussing it on the phone.

(102) On or about July 26, 2005, defendant THOMAS DURKIN informed defendant EDUARDO GONZALEZ-GALLEGOS that defendant GEORGE FERNANDEZ was going to "take care" of Alvaro Hernandez.

(103) On or about July 26, 2005, defendant THOMAS DURKIN assured defendant EDUARDO GONZALEZ-GALLEGOS that defendant GEORGE FERNANDEZ was a good person to handle the problem with Alvaro Hernandez because FERNANDEZ would be "quiet about it," to which GONZALEZ replied, "so long as he don't start braggin'."

(104) On or about July 27, 2005, defendant JESSIE MUNOZ gave defendant JAVIER CASTRELLON permission to "tax" individuals selling narcotics in the Encinitas and Fallbrook areas of San Diego.

(105) On or about July 28, 2005, at approximately 1:00 a.m., defendant JOSHUA CRUZ arranged a meeting with Alvaro Hernandez.

//

(106) On or about July 28, 2005, at approximately 12:21 a.m., 2:16 a.m., 2:24 a.m., 2:25 a.m. and 2:39 a.m. defendant JOSHUA CRUZ placed and/or received telephone calls to/from defendant GEORGE FERNANDEZ.

(107) On or about July 28, 2005, at approximately 2:41 a.m., defendant JOSHUA CRUZ arranged to meet with Alvaro Hernandez at 4th Street and Palm Street in National City, California.

(108) On or about July 28, 2005, at approximately 2:57 a.m., defendant JOSHUA CRUZ spoke with Alvaro Hernandez, who informed CRUZ where he was located at the time; CRUZ acknowledged that he saw Hernandez and Hernandez' vehicle.

(109) On or about July 28, 2005, at approximately 3:10 a.m., defendant JOSHUA CRUZ used a 9 mm handgun to shoot and kill Alvaro Hernandez.

(110) On or about July 28, 2005, at approximately 3:19 a.m., 3:21 a.m. and 3:24 a.m., defendant JOSHUA CRUZ placed and/or received telephone calls to/from defendant GEORGE FERNANDEZ.

(111) On or about July 28, 2005, defendant RICARDO MARTINEZ ordered a quantity of heroin from defendant THOMAS DURKIN; MARTINEZ arranged to have the heroin smuggled into USP Victorville, where MARTINEZ was incarcerated.

(112) On or about July 29, 2005, defendant THOMAS DURKIN authorized defendant JAVIER CASTRELLON to collect a $1000 "tax" payment from a heroin dealer on the Rincon Indian Reservation in San Diego County.

(113) On or about July 29, 2005, defendant JAVIER CASTRELLON, accompanied by three individuals, traveled to the Rincon Indian Reservation to collect a "tax" payment from a heroin dealer.

(114) On or about July 29, 2005, defendant JESSIE MUNOZ provided defendant THOMAS DURKIN with a quantity of narcotics, which DURKIN distributed to another individual.

(115) On or about July 30, 2005, defendant EDNA DAVILA informed defendant THOMAS DURKIN that she was capable of body-cavity smuggling 3 or 3 ½ ounces of heroin.

(116) On or about August 1, 2005, defendant EDUARDO GONZALEZ-GALLEGOS informed defendant THOMAS DURKIN that defendant GEORGE FERNANDEZ "kept his word on that," meaning that FERNANDEZ successfully arranged for the murder of Alvaro Hernandez; DURKIN responded, "yeah . . . you play, you pay."

(117) On or about August 1, 2005, defendant THOMAS DURKIN informed defendant JESSIE MUNOZ that Alvaro Hernandez was "no longer a problem."

(118) On or about August 1, 2005, defendants THOMAS DURKIN, JESSIE MUNOZ, JAVIER CASTRELLON, CESAR MOEDANO (by telephone), and others, met at a restaurant in Escondido, California, to discuss, among other things, the "taxation" of drug dealers.

(119) On or about August 1, 2005, during the meeting at a restaurant in Escondido, California, defendant THOMAS DURKIN instructed one or more of the individuals

present at the meeting to use baseball bats to assault "Peanut," a heroin dealer on the Rincon Indian Reservation.

(120) On or about August 1, 2005, defendant JAVIER CASTRELLON and members of his "taxing crew" possessed firearms.

(121) On or about August 1, 2005, defendant JESSIE MUNOZ instructed defendant CESAR MOEDANO to collect a "tax" payment from Joshua Hernandez (charged elsewhere); MOEDANO informed MUNOZ that a member of his "crew" had begun "taxing" three new people.

(122) On or about August 2, 2005, Amy Simpson (charged elsewhere) ordered 1 pound of methamphetamine from defendant JESSIE MUNOZ.

(123) On or about August 2, 2005, defendant THOMAS DURKIN provided defendant EDNA DAVILA with approximately 25 grams of heroin, which DURKIN had packaged in a plastic bag covered by a latex "finger," so that DAVILA could smuggle the heroin into USP Victorville.

(124) On or about August 2, 2005, defendant EDNA DAVILA transported approximately 25 grams of heroin from San Diego to Los Angeles.

(125) On or about August 3, 2005, defendant THOMAS DURKIN ordered a quantity of methamphetamine from defendant GUILLERMO REYES.

(126) On or about August 4, 2005, defendant JAVIER CASTRELLON informed defendant JESSIE MUNOZ that he had identified a new individual selling narcotics in

Encinitas, California, and that CASTRELLON would "drop the bomb on him," that is, inform the narcotics dealer that he would be required to pay "taxes" to the Mexican Mafia if he continued to sell narcotics in Encinitas.

(127) On or about August 7, 2005, defendant GUILLERMO REYES, at the direction of defendant EDUARDO GONZALEZ-GALLEGOS, delivered approximately one ounce of methamphetamine to defendant THOMAS DURKIN.

(128) On or about August 8, 2005, defendant CESAR MOEDANO informed defendant JESSIE MUNOZ that an individual was refusing to pay him (MOEDANO); MOEDANO stated that he would tell the individual that he was going to have to "kick in" whether he wanted to or not.

(129) On or about August 9, 2005, defendant EDNA DAVILA informed THOMAS DURKIN that the heroin had been successfully delivered to defendant RICARDO MARTINEZ at USP Victorville.

(130) On or about August 9, 2005, defendant THOMAS DURKIN informed defendant EDUARDO GONZALEZ-GALLEGOS that the heroin had been successfully delivered to defendant RICARDO MARTINEZ at USP Victorville.

(131) On or about August 9, 2005, defendant RICARDO MARTINEZ gave defendant EDNA DAVILA instructions on how to send him money in prison without arousing the suspicion of prison officials.

//

//

(132) On or about August 9, 2005, defendant JAVIER CASTRELLON informed defendant THOMAS DURKIN that he was going to collect a debt owed by "Nati," a narcotics distributor in Fallbrook, California.

(133) On or about August 15, 2005, defendant EDUARDO GONZALEZ-GALLEGOS sent a money order in the amount of $100 United States currency to Mexican Mafia member Reynaldo Ayala (charged elsewhere) at San Quentin State Prison.

(134) On or about August 15, 2005, defendant GUILLERMO REYES delivered approximately 2 ounces of methamphetamine to defendant THOMAS DURKIN.

(135) On or about August 15, 2005, defendant THOMAS DURKIN possessed, with intent to distribute, approximately 2 ounces of methamphetamine.

(136) On or about August 18, 2005, defendant JESSIE MUNOZ ordered 1½ pounds of methamphetamine from defendant ANGELA ESPARZA.

(137) On or about August 18, 2005, within the Central District of California, defendant ANGELA ESPARZA distributed approximately 1½ pounds of methamphetamine to Rusty Perez (charged elsewhere).

(138) On or about August 18, 2005, Rusty Perez (charged elsewhere) delivered approximately 1½ pounds of methamphetamine to defendant JESSIE MUNOZ.

(139) On or about August 18, 2005, defendant JESSIE MUNOZ distributed approximately 1 pound of methamphetamine to Amy Simpson (charged elsewhere).

(140) On or about August 18, 2005, defendant JOSHUA CRUZ possessed an address book which contained the name and contact numbers for defendant GEORGE FERNANDEZ.

(141) On or about August 19, 2005, defendants THOMAS DURKIN and JESSIE MUNOZ met at a restaurant to discuss matters of concern to the Mexican Mafia, including the ongoing investigation of the Alvaro Hernandez murder and recent drug seizures made by law enforcement authorities.

(142) On or about August 19, 2005, defendant JESSIE MUNOZ informed defendant JUVENAL VEGA-SOTO that in regard to the problems surrounding Alvaro Hernandez, "we took care of everything . . . we didn't give him a choice, yeah, but it's been handled."

(143) On or about August 26, 2005, defendant JOSHUA CRUZ informed GEORGE FERNANDEZ that CRUZ had only been arrested for evading arrest and not for his involvement in the Alvaro Hernandez murder; CRUZ also offered to conduct an assault on another inmate for FERNANDEZ.

(144) On or about August 31, 2005, Gerardo Medina Cortez (charged elsewhere) delivered approximately one-half pound of methamphetamine to defendant JESSIE MUNOZ.

(145) On or about August 31, 2005, defendant JESSIE MUNOZ provided Donovan Oran (charged elsewhere) with approximately a quarter-pound of methamphetamine.

//

//

(146) In or about September 2005, defendant GEORGE FERNANDEZ distributed approximately 113 grams of methamphetamine.

(147) In or about September 2005, defendant JUVENAL VEGA-SOTO imported approximately 7 pounds of methamphetamine into the United States from Mexico.

(148) On or about September 13, 2005, defendant JESSIE MUNOZ informed defendant JAVIER CASTRELLON that MUNOZ and CASTRELLON were working for defendant RICARDO MARTINEZ.

(149) On or about September 14, 2005, defendant JESSIE MUNOZ provided defendant JAVIER CASTRELLON with the telephone number for an individual who owed a $4,500 debt to MUNOZ; CASTRELLON stated that he would contact the individual and "let him know what time it is," that is, inform the individual that the debt must be paid.

(150) On or about September 17, 2005, defendant JESSIE MUNOZ ordered a quarter-pound of methamphetamine from Gerardo Medina-Cortez (charged elsewhere).

(151) On or about September 17, 2005, the wife of defendant THOMAS DURKIN, informed defendant DEMITRO CONTRERAS that DURKIN had given CONTRERAS the authority to "tax" on behalf of the Mexican Mafia.

(152) On or about September 18, 2005, defendant JAVIER CASTRELLON ordered methamphetamine from defendant JESSIE MUNOZ.

//

(153) On or about September 19, 2005, defendant ANGELA ESPARZA, acting on behalf of defendant JUVENAL VEGA-SOTO, informed defendant JESSIE MUNOZ that MUNOZ needed to pay $7,000 to defendant MARY LOU VEGA for the 1 pound of methamphetamine MARY LOU VEGA provided to MUNOZ on August 18, 2005.

(154) On or about September 24, 2005, defendant JESSIE MUNOZ asked defendant JAVIER CASTRELLON whether or not "the guy" had returned "the toy . . . the 3-8" to CASTRELLON, that is, a .38 caliber handgun.

(155) On or about September 24, 2005, defendant JESSIE MUNOZ instructed defendant DEMITRO CONTRERAS to return "the toy" to defendant JAVIER CASTRELLON.

(156) On or about September 27, 2005, defendant DEMITRO CONTRERAS informed defendant JESSIE MUNOZ that CONTRERAS gave "the thing," that is, a gun, to defendant JAVIER CASTRELLON.

(157) On or about September 27, 2005, defendant JESSIE MUNOZ informed "Junior," a narcotics dealer in Fallbrook, California, that he had assigned defendant JAVIER CASTRELLON to collect the payment owed by "Junior."

(158) On or about September 28, 2005, defendant GEORGE FERNANDEZ distributed approximately 113 grams of methamphetamine.

(159) On or about September 30, 2005, defendant JAVIER CASTRELLON possessed a sawed-off shotgun.

(160) On or about October 18, 2005, defendant EDUARDO GONZALEZ-GALLEGOS, using the alias "Mike Bibby," sent

a letter USP Marion inmate and Mexican Mafia member Raymond Mendez (charged elsewhere), wherein GONZALEZ stated that he had sent Mendez and other imprisoned Mexican Mafia members money.

(161) On or about October 21, 2005, defendant ANGELA ESPARZA, acting at direction of defendant MARY LOU VEGA, asked defendant JUVENAL VEGA-SOTO whether he would be sending any methamphetamine to ESPARZA and MARY LOU VEGA.

(162) On or about October 23, 2005, defendant DEMITRO CONTRERAS informed defendant JESSIE MUNOZ that he was going to rob $750 from a methamphetamine customer, a third of which CONTRERAS stated he would give to MUNOZ; MUNOZ gave CONTRERAS permission to conduct the robbery.

(163) On or about October 23, 2005, defendant ANGELA ESPARZA informed defendant JUVENAL VEGA-SOTO that an attorney would be traveling to Tijuana, Mexico, to meet with VEGA.

(164) On or about October 23, 2005, an attorney traveled to Tijuana, Mexico, where the attorney provided defendant JUVENAL VEGA-SOTO with information about the law enforcement seizure of approximately 7 pounds of methamphetamine and the resulting arrest of Ambrose Almeida (charged elsewhere).

(165) On or about October 24, 2005, defendant ANGELA ESPARZA asked defendant JUVENAL VEGA-SOTO when the next shipment of methamphetamine would arrive because

ESPARZA's customers were "bugging her," that is, asking to purchase methamphetamine.

(166) On or about October 25, 2005, defendant JUVENAL VEGA-SOTO informed defendant ANGELA ESPARZA that he would notify ESPARZA as soon as the methamphetamine crossed the border.

(167) On or about October 25, 2005, defendant ANGELA ESPARZA, at the direction of defendant MARY LOU VEGA, informed defendant JUVENAL VEGA-SOTO that an individual had stolen some of the narcotics which belonged to JUVENAL VEGA.

(168) On or about October 26, 2005, defendant CESAR MOEDANO met with defendant JESSIE MUNOZ and provided MUNOZ with "tax" money MOEDANO had collected on behalf of the Mexican Mafia.

(169) On or about October 26, 2005, defendant JUVENAL VEGA-SOTO informed defendant MARTIN REYES that VEGA would be sending REYES a 21 pound methamphetamine shipment from Mexico to the United States.

(170) On or about October 26, 2005, defendant MARY LOU VEGA informed defendant JUVENAL VEGA-SOTO that she was going to send ANGELA ESPARZA to deliver the methamphetamine purchase money to defendant MARTIN REYES.

(171) On or about October 27, 2005, within the Central District of California, defendant JESUS ANTONIO ARMENTA delivered approximately 21 pounds of methamphetamine to defendant MARTIN REYES.

(172) On or about October 27, 2005, within the Central District of California, defendant MARTIN REYES distributed approximately 10 pounds of methamphetamine to defendant ROBERT ROMERO.

(173) On or about October 27, 2005, within the Central District of California, defendant ROBERT ROMERO informed defendant JUVENAL VEGA-SOTO that he was with defendant MARTIN REYES and that although ROMERO had successfully picked up the methamphetamine, defendant MARY LOU VEGA may have been followed earlier in the day by law enforcement surveillance officers.

(174) On or about October 27, 2005, within the Central District of California, defendant MARTIN REYES distributed approximately 5 pounds of methamphetamine to Jose Alvarez, aka Tattoo (charged elsewhere).

(175) On or about October 27, 2005, within the Central District of California, defendant MARTIN REYES distributed approximately 1 pound of methamphetamine to ANGELA ESPARZA.

(176) On or about October 27, 2005, within the Central District of California, defendant MARTIN REYES provided approximately two pounds of methamphetamine to defendant MARY LOU VEGA.

(177) On or about October 29, 2005, defendant CESAR MOEDANO distributed approximately 1 ounce of heroin, intending that the heroin be smuggled into Calipatria State Prison.

//

(178) On or about October 29, 2005, defendants JESSIE MUNOZ and JUVENAL VEGA-SOTO discussed various methods of payment for the 1 pound of methamphetamine which law enforcement officers seized from Amy Simpson (charged elsewhere) on August 18, 2005.

(179) On or about October 30, 2005, within the Central District of California, Jose Alvarez (charged elsewhere) provided defendant MARTIN REYES with the proceeds from the sale of methamphetamine.

(180) On or about October 31, 2005, defendant JUVENAL VEGA-SOTO directed MARTIN REYES to collect the proceeds from the sale of methamphetamine, indicating that timely collection of those proceeds was necessary because VEGA had just "lost" 7 pounds of methamphetamine to law enforcement authorities.

(181) In or about November, 2005, within the Central District of California, defendant MARY LOU VEGA delivered a bag containing the proceeds from the sale of methamphetamine to defendant MARTIN REYES.

(182) On or about November 1, 2005, within the Central District of California, defendant ROBERT ROMERO provided defendant MARTIN REYES with approximately $45,000 in United States currency, which represented the proceeds from the sale of methamphetamine.

(183) On or about November 1, 2005, within the Central District of California, defendant MARTIN REYES provided approximately $71,000 in United States currency to defendant JESUS ANTONIO ARMENTA.

(184) On or about November 1, 2005, defendant JESUS ANTONIO ARMENTA transported approximately $71,000 in United States currency from the United States to Mexico, where ARMENTA delivered the money to defendant JUVENAL VEGA-SOTO.

(185) On or about November 3, 2005, defendant JUVENAL VEGA-SOTO arranged for the importation of approximately 5 pounds of methamphetamine into the United States from Mexico.

(186) On or about November 3, 2005, defendant JESUS ANTONIO ARMENTA imported approximately 5 pounds of methamphetamine into the United States from Mexico.

(187) On or about November 3, 2005, defendant JESUS ANTONIO ARMENTA distributed approximately 5 pounds of methamphetamine to Jose Ramirez.

(188) On or about November 3, 2005, within the Central District of California, defendant ROBERT ROMERO provided defendant MARTIN REYES with approximately $23,000 in United States currency, which represented the proceeds from the sale of methamphetamine.

(189) On or about November 6, 2005, defendant MARY LOU VEGA ordered multiple pounds of methamphetamine from defendant JUVENAL VEGA-SOTO; MARY LOU VEGA further stated that she was collecting the money from the sale of methamphetamine to give to defendant MARTIN REYES.

(190) On or about November 6, 2005, within the Central District of California, defendant MARY LOU VEGA attempted to recruit an individual to handle the

importation of methamphetamine into the United States from Mexico.

(191) On or about November 6, 2005, defendant JUVENAL VEGA SOTO informed defendant ROBERT ROMERO that VEGA had contacted a former gang member who was not an attorney in Los Angeles to determine whether Jose Ramirez (charged elsewhere), arrested on November 3, 2005, for possessing 5 pounds of methamphetamine, was cooperating with law enforcement authorities.

(192) On or about November 7, 2005, defendant MARY LOU VEGA informed defendant JUVENAL VEGA-SOTO that defendant MARTIN REYES was traveling to Mexico to deliver the proceeds from the sale of methamphetamine to JUVENAL VEGA.

(193) On or about November 7, 2005, defendant MARTIN REYES transported approximately $41,000 in United States currency from the United States to Mexico, where REYES delivered the money to defendant JUVENAL VEGA-SOTO.

(194) On or about November 7, 2005, defendant DEMITRO CONTRERAS informed defendant JESSIE MUNOZ that CONTRERAS had collected a $50 payment from an individual; CONTRERAS further stated that he informed the individual that the individual had three days to pay an additional $500 or risk being assaulted.

(195) On or about November 8, 2005, defendant CESAR MOEDANO distributed approximately 2 grams of methamphetamine to Dale Richard Vessell, aka Robert (charged elsewhere).

(196) On or about November 8, 2005, defendant THOMAS DURKIN told his wife to warn defendant EDUARDO GONZALEZ-GALLEGOS that law enforcement officers were investigating the murder of Alvaro Hernandez and that she should tell GONZALEZ to leave San Diego.

(197) On or about November 8, 2005, defendant EDUARDO GONZALEZ-GALLEGOS possessed a false identification in the name of his brother, correspondence authored by Mexican Mafia members and associates, and a contact number for defendant JESSIE MUNOZ.

(198) On or about November 9, 2005, defendant THOMAS DURKIN spoke with his wife about the ongoing murder investigation of Alvaro Hernandez and stated that "they [the police] have the whole thing down pat, except for him [defendant GONZALEZ] . . . they have everything else, I can't imagine they don't have him [defendant GONZALEZ]."

(199) On or about November 9, 2005, defendant JESSIE MUNOZ provided defendant JESUS ANTONIO ARMENTA with $3,000 United States currency as a partial payment for 1 pound of methamphetamine.

(200) On or about November 9, 2005, defendant JESUS ANTONIO ARMENTA transported approximately $3,000 in United States currency from the United States to Mexico, where, several days later, ARMENTA delivered the money to defendant JUVENAL VEGA-SOTO.

//

//

(201) On or about November 11, 2005, defendant THOMAS DURKIN warned his wife that the police were investigating the murder of Alvaro Hernandez, and stated, "this could be some serious shit, so get ready."

(202) On or about November 14, 2005, defendant JUVENAL VEGA-SOTO informed defendant JESUS ANTONIO ARMENTA that 20 or 22 pounds of methamphetamine would be available the next day for importation into the United States from Mexico.

(203) On or about November 15, 2005, defendant JUVENAL VEGA-SOTO informed defendant MARTIN REYES to get the purchase money ready because defendant JESUS ANTONIO ARMENTA would be making a methamphetamine delivery to REYES the next day.

(204) On or about November 15, 2005, defendant JUVENAL VEGA-SOTO informed defendant ROBERT ROMERO that VEGA would have methamphetamine delivered to ROMERO and others the next day.

(205) On or about November 15, 2005, defendant MARTIN REYES informed defendant JUVENAL VEGA-SOTO that REYES had $18,000 ready for the purchase of methamphetamine.

(206) On or about November 16, 2005, defendant JUVENAL VEGA-SOTO arranged to have defendant JESUS ANTONIO ARMENTA import approximately 13 pounds of methamphetamine into the United States from Mexico.

(207) On or about November 16, 2005, defendant JUVENAL VEGA-SOTO informed defendant MARTIN REYES that 13 pounds of methamphetamine would be delivered to REYES that day,

and that the rest of the methamphetamine would be delivered during the upcoming weekend.

(208) On or about November 16, 2005, defendant JUVENAL VEGA-SOTO instructed defendant MARTIN REYES to give defendant ROBERT ROMERO 10 pounds of the methamphetamine.

(209) On or about November 16, 2005, defendant JESUS ANTONIO ARMENTA possessed, with intent to distribute, approximately 13 pounds of methamphetamine.

(210) On or about November 16, 2005, defendant JESUS ANTONIO ARMENTA distributed approximately 1 pound of methamphetamine to Alex Araujo (charged elsewhere).

(211) On or about November 16, 2005, defendant JESUS ANTONIO ARMENTA and his mother, Maria Armenta (charged elsewhere), transported approximately 12 pounds of methamphetamine from Chula Vista, California, to Ontario, California.

(212) On or about November 21, 2005, defendant CESAR MOEDANO met with defendant JESSIE MUNOZ and paid MUNOZ "tax" money which MOEDANO had collected from individuals selling narcotics.

(213) On or about November 23, 2005, defendant JUVENAL VEGA-SOTO instructed defendant ANGELA ESPARZA to "change the number," that is, obtain a new cellular telephone number, due to the arrest of defendant JESUS ANTONIO ARMENTA and ARMENTA's mother on November 16, 2005.

//

//

(214) On or about November 23, 2005, defendant ANGELA ESPARZA informed defendant JUVENAL VEGA-SOTO that defendant MARY LOU VEGA conducted a computer records check, but that MARY LOU VEGA was unable to locate any information on the case against JESUS ANTONIO ARMENTA and ARMENTA's mother.

(215) On or about November 24, 2005, defendant MARY LOU VEGA informed defendant JUVENAL VEGA-SOTO that "the feds own all of Nextel," and that JUVENAL VEGA should therefore use prepaid telephones, like "Virgin Mobile."

(216) On or about November 30, 2005, defendants MARY LOU VEGA and JUVENAL VEGA-SOTO discussed whether defendant JESUS ANTONIO ARMENTA was cooperating with law enforcement authorities.

(217) On or about November 30, 2005, defendant JUVENAL VEGA-SOTO instructed defendant MARY LOU VEGA to tell defendant MARTIN REYES to change his telephone numbers.

(218) On or about December 2, 2005, defendant JUVENAL VEGA-SOTO informed defendant MARY LOU VEGA that there would be a methamphetamine delivery the next day.

(219) On or about December 2, 2005, defendant CESAR MOEDANO distributed approximately 14 grams of methamphetamine.

(220) On or about December 6, 2005, defendant JESSIE MUNOZ informed defendant THOMAS DURKIN that defendant DEMITRO CONTRERAS was collecting "taxes."

//

(221) On or about December 6, 2005, defendant JESSIE MUNOZ possessed approximately 14 grams of methamphetamine, 6 handguns, including a MAC-10 semi-automatic assault pistol, 3 long guns, "cutting" agents, scales and correspondence authored by Mexican Mafia members and associates.

(222) On or about December 19, 2005, defendant CESAR MOEDANO provided defendant JESSIE MUNOZ with $400 United States currency, which MOEDANO had collected from individuals selling narcotics in and around San Marcos, California.

(223) On or about December 22, 2005, defendant JESSIE MUNOZ sent a portion of the "tax" money collected by defendant CESAR MOEDANO, that is, $100 United States currency to defendant THOMAS DURKIN at George Bailey Detention Facility.

(224) On or about December 27, 2005, defendant THOMAS DURKIN sent a letter from George Bailey Detention Facility to defendant JESSIE MUNOZ, wherein DURKIN instructed MUNOZ to use the remaining $300 "tax" money collected by defendant CESAR MOEDANO to purchase heroin, which DURKIN directed MUNOZ to send to him (DURKIN) in jail.

(225) On or about January 4, 2006, defendant JESSIE MUNOZ sent defendant JUVENAL VEGA-SOTO, via wire transfer from the United States to Mexico, $3,000 United States currency as a partial payment for 1 pound of methamphetamine.

//

(226) On or about January 12, 2006, defendant JESSIE MUNOZ provided the wife of defendant THOMAS DURKIN with $300 United States currency, which represented the remaining balance of the $400 "tax" collected by defendant CESAR MOEDANO.

(227) On or about January 27, 2006, defendant CESAR MOEDANO provided defendant JESSIE MUNOZ with $340 United States currency, which MOEDANO had collected from individuals selling narcotics in and around San Marcos, California.

(228) On or about February 15, 2006, defendant JESSIE MUNOZ sent a portion of the "tax" money collected by defendant CESAR MOEDANO, that is, $300 United States currency, to defendant THOMAS DURKIN at George Bailey Detention Facility.

(229) On or about February 20, 2006, within the Central District of California, defendant EDNA DAVILA possessed, with intent to deliver to defendant RICARDO MARTINEZ at USP Victorville, approximately 7 grams of heroin.

(230) On or about February 20, 2006, defendant RICARDO MARTINEZ instructed defendant EDNA DAVILA to send money to Mexican Mafia associate Seggria Lamose Broome (charged elsewhere).

(231) On or about February 20, 2006, defendant EDNA DAVILA sent a money order in the amount of $100 United States currency to USP Victorville inmate Seggria Lamose Broome (charged elsewhere).

(232) On or about March 1, 2006, defendant RICARDO MARTINEZ instructed defendant EDNA DAVILA to send money to several different incarcerated Mexican Mafia members and associates.

(233) On or about March 1, 2006, defendant EDNA DAVILA sent a money order in the amount of $50 United States currency to USP Victorville inmate Raul Mancia-Brado (charged elsewhere).

(234) On or about March 1, 2006, defendant EDNA DAVILA sent a money order in the amount of $100 United States currency to USP Victorville inmate Jose Gamez-Reyes (charged elsewhere).

(235) On or about March 10, 2006, defendant CESAR MOEDANO provided defendant JESSIE MUNOZ with $400 United States currency, which MOEDANO had collected from individuals selling narcotics in and around San Marcos, California.

(236) On or about March 10, 2006, defendant CESAR MOEDANO sold defendant JESSIE MUNOZ a .380 semi-automatic pistol for $150.

(237) On or about March 24, 2006, within the Central District of California, defendant EDNA DAVILA possessed correspondence authored by Mexican Mafia members and associates.

//

//

//

//

(238) On or about March 28, 2006, defendant JESSIE MUNOZ sent a portion of the "tax" money collected by defendant CESAR MOEDANO, that is, $200 United States currency, to defendant THOMAS DURKIN at George Bailey Detention Facility.

All in violation of Title 18, United States Code, Section 1962(d).

DATED: June 6, 2006.

A TRUE BILL:

[signature]

Foreperson

CAROL C. LAM
United States Attorney

By: [signature]
TODD W. ROBINSON
Assistant U.S. Attorney